**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CARDELLI ENTERPRISE, L.L.C., individually and on behalf of others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | ***JURY TRIAL DEMANDED*** |
| v. | ) ) | |
| SOCIETY INSURANCE, a mutual company | ) ) ) | |
| Defendant | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Cardelli Enterprise, L.L.C. ("**Cardelli**") individually and on behalf of all other members of the class defined herein (collectively, the "**Class**"), brings this Class Action Complaint against Defendant Society Insurance, a mutual company ("**Defendant**" or "**Society Insurance**"), and in support thereof states:

## INTRODUCTION

1.      Plaintiff is the owner and operator of Enzo & Lucia Italian restaurant and bar in historic downtown Long Grove, Illinois, which was forced, by recent orders issued by the Governor of the State of Illinois, to suspend all on-premises dining and beverage consumption operations – through no fault of its own – as part of the State's efforts to slow the spread of the global COVID-19 pandemic. The closures mandated by these government orders poses an existential threat to Plaintiff's business, which employs many Illinois residents.

2.      To protect its businesses from situations like these, which threaten the health, safety and livelihood of Plaintiff's employees and customers due to factors wholly outside of its control, Plaintiff obtained business interruption insurance from Society Insurance.  The Policy is an "all-risk" policy that provides broad coverage for losses caused by any cause unless expressly

excluded. The Policy does not exclude losses from viruses or pandemics. Thus, the all-risk Policy purchased by Plaintiff covers losses caused by viruses, such as COVID-19

3.      On March 16, 2020, during the term of the policy issued by Society Insurance to Plaintiff, Illinois Governor J.B. Pritzker issued Executive Order 2020-07 mandating that all restaurants and bars suspend all on-premises consumption of food and beverages due to the "ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness[.]"  Thereafter, Governor Pritzker issued additional COVID-19 Executive Orders that extended these restrictions into the future, with the current Executive Order 2020-33 extending this suspension through May 29, 2020.

4.      Due to the global COVID-19 pandemic, and in compliance with the resulting civil action orders issued by Governor Pritzker, Plaintiff was forced to close all on-premises indoor and outdoor dining and beverage consumption areas to the general public as part of the State of Illinois' efforts to combat the spread of COVID-19, and in order to prevent further damage and minimize the suspension of its business. As a result, Plaintiff has suffered substantial lost income, incurred extra expenses to minimize the suspension of its business, and has been forced to furlough or lay off a substantial number of its workers.

5.      In blatant breach of its insurance obligations that it voluntarily undertook in exchange for Plaintiff's premium payments, Society Insurance has denied Plaintiff's claims arising from the COVID-19 pandemic and resulting State of Illinois Civil Action Orders mandating the suspension of its ordinary business operations.

6.      As a result, Plaintiffs now bring this action against Society Insurance for its failure to honor its contractual obligations under insurance policy that it issued to Plaintiff, that provides coverage for, among other things, losses incurred due to the "necessary suspension" of its business operations, including when such a suspension is due to a government order.

7.     Furthermore, despite Society Insurance's express promise to cover and pay for the Plaintiff's business interruption losses, Society Insurance has issued blanket denials to Plaintiff and other similarly situated Illinois businesses related to COVID-19 and the civil action orders of the Governor, without first conducting any meaningful coverage investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law.

8.     In fact, on March 16, 2020, before the Plaintiff had even submitted its insurance claim related to these losses, Society Insurance circulated a memorandum from its CEO Rick Parks to Society's "agency partners," acknowledging that States, such as Illinois, had "taken steps to limit operations of certain businesses," but prospectively concluding that Society Insurance's policies would likely not provide coverage for losses due to a "governmental imposed shutdown due to COVID-19 (coronavirus)." A copy of this memorandum is attached hereto as **Exhibit A**.

9.     To the extent Society Insurance has provided any reason to Plaintiff for its categorical assertion that Plaintiff's losses are not covered, it is based on the assertion that, among other things, the "actual or alleged presence of the coronavirus," which led to the Governor's Civil Action Orders that suspended Plaintiff's business operations, does not constitute a "Covered Cause of Loss" under the Policy. *See* April 22, 2020 letter attached here as **Exhibit B**.

10.     But Society Insurance's conclusory statement that the actual or alleged presence of a substance like COVID-19 does not result in property damage is contrary to the law in Illinois. Illinois courts have consistently held that the presence of a dangerous substance in a property constitutes "physical loss or damage." *See, e.g.*, *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E.2d 622, 625-26 (Ill. Ct. App. 1999), as modified on denial of reh'g (Dec. 3, 1999).

11.     Moreover, unlike many commercial property policies available in the market, the policies sold by Society Insurance do not include an exclusion for loss caused by any virus. Thus, Plaintiff reasonably expected that the insurance it purchased from Society Insurance included coverage for property damage and business interruption losses caused by viruses like COVID-19.

12.     If Society Insurance had wanted to exclude viruses or pandemic-related losses under the Plaintiff's policy – as many other insurers have done in other policies – it easily could have done so on the front-end with an express exclusion of coverage. Instead, Society Insurance waited until after it collected Plaintiff's premium payment, and after the global COVID-19 pandemic and the resulting civil action orders caused catastrophic business losses to Plaintiff, to try and limit its exposure on the back-end through its erroneous assertion that the presence of the coronavirus is not "physical loss" and therefore is not a Covered Cause of Loss under the policy.

13.     The fact that the insurance industry has created specific exclusions for viruses and pandemic-related losses under similar commercial property policies undermines Society Insurance's assertion that the presence of a virus, like COVID-19, does not cause "physical loss of or damage to" property.  Indeed, if a virus could never result in a "physical loss" or "damage" to property, there would be no need for such an exclusion.  Moreover, Society Insurance ignores the clear fact that its policy promised to provide coverage for losses incurred due to government actions "taken in response to dangerous physical conditions," even if those dangerous physical conditions cause damage to property at locations other than those insured under their policies.

14.     Society Insurance's wholesale, cursory coverage denials are arbitrary and unreasonable, and inconsistent with the facts and plain language of the policies it issued. The coverage denials appear to be driven by Society Insurance's desire to preempt its own financial exposure to the global COVID-19 pandemic, rather than to initiate, as Society is obligate to do, a

full and fair investigation of the claims and a careful review of the policies they sold to Plaintiff in exchange for valuable premiums.

15.     To right the wrongs committed by the Defendant, Plaintiff brings this action against Defendant, on its behalf and on behalf of all other persons similarly situated, for a declaratory judgment establishing that they are entitled to receive the benefit of the insurance coverage they purchased, for breach of Defendant's contract obligations in the insurance policy to indemnify and pay for, among other things, loss of business income and extra expenses incurred, and for bad faith claims handling under Illinois law, including 215 ILCS 5/155.

## PARTIES

16.     Plaintiff Cardelli Enterprise, L.L.C. ("**Cardelli**") is an Illinois limited liability company. The members of Cardelli are Glenn Cardelli and Renata Cardelli, both of whom are Illinois citizens.  Cardelli owns and operates Enzo & Lucia Italian restaurant and bar, located at 343 Old McHenry Road, Long Grove, Illinois, which is its principal place of business.

17.     Defendant Society Insurance, a mutual company ("**Society**") is an insurance company incorporated under the laws of the State of Wisconsin, and it maintains a principal place of business in Fond du Lac, Wisconsin. At all relevant times, Society has been, and is currently, authorized to write, sell, and issue insurance policies to businesses in Illinois, and it has been, and is currently, engaged in conducting and transacting business in the State of Illinois by selling and issuing insurance policies to businesses in Illinois, such as Plaintiff. .

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that section apply to this case

20.     This Court has personal jurisdiction over Defendant pursuant to the Illinois "long arm statute," 735 ILCS 5/2-209, because Defendant has submitted to jurisdiction in this state by: (a) transacting business in Illinois; (b) contracting to insure a person, property, or risk located within Illinois at the time of contracting; and (c) making a contract substantially connected with Illinois.     735 ILCS 5/2-209(1), 2-209(4), 2-209(7).     Furthermore, Defendant exercises substantial, systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

21.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the Policy with respect to the loss of business income and extra expense arising from the events detailed in this Complaint.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred within the Northern District of Illinois

## FACTUAL BACKGROUND

### The Insured Business

23.     Through Cardelli Enterprise, L.L.C., Renata and Glenn Cardelli have owned and operated Enzo & Lucia Italian restaurant and bar since 2007.  Over the years, Glenn, Renata and their staff have worked tirelessly to ensure a consistently high quality dining and entertainment experience that has allowed Enzo & Lucia to achieve an excellent reputation in the Chicagoland

area and to be a consistently profitable business

24.     Until the devastating events and occurrences described herein, Enzo & Lucia offered a full menu of food and beverages for on-premises consumption, with both indoor and outdoor private dining, and a small bar area. Enzo & Lucia's upper dining room seats 100 people, serving lunch and dinner seven days per week. Its lower level dining seats 75 people and is used for private events, such as weddings, holiday celebrations and graduation parties. The restaurant's outdoor dining area seats 64 people.

### The Society Insurance All-Risk Policy

25.     Society Insurance has engaged in the marketing and sale of its insurance policies in the State of Illinois since the 1990s.[1]

26.     In 2019, Society sold Plaintiff an "all-risk" insurance policy, known as a Businessowners Policy (No. BP15031255-4) with an effective date of coverage from October 26, 2019 to October 26, 2020 (the "**Policy**"). A copy of the Policy is attached hereto as **Exhibit C**.

27.     Society issued the Policy to Plaintiff at its principal place of business in Illinois.

28.     At all relevant times, the Policy covered Enzo & Lucia's restaurant and bar operations and premises at the address alleged above and in the Declarations page. Ex. C at 3.

29.     Plaintiff has performed all of its obligations under the Policy, including, but not limited to, the payment of premiums to Defendant and the timely reporting of its claim.

30.     The Policy has been in effect at all times since October 26, 2019, without interruption.

31.     The Policy consists of various policy forms, including but not limited to form number TBP2 05-15 (also referred to as form number TBP2 (05-15)), entitled "Businessowners Special Property Coverage Form" (hereinafter, the "**Businessowners Form"**). See Exhibit C at 33-64.

---

[1]  *See e.g.*, Society Insurance webinar for Illinois Agents, 2/24/2020 "Society Sizzle: Ease of Doing Business with Society Insurance | Illinois Agents". https://www.youtube.com/watch?v=ktz2e0J-tzE&feature=youtu.be

32.     Section A of the Businessowners Form provides coverage to Plaintiff for property damage whereby Society Insurance agreed to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." *See* Ex. C, Businessowners Form at § A (hereinafter, BF **§ __.**)

33.     The Policy defines "Covered Cause of Loss" as "Direct Physical Loss unless the loss is excluded or limited under this coverage form."  *See* Ex. C, BF § A.3.  The Policy does not contain any additional definition of the phrase "Covered Cause of Loss."

34.     Unlike many commercial property insurance policies available on the market, the Policy that Society Insurance sold to Plaintiff is an "all-risk" Policy, meaning that the Policy covers all risks and losses unless specifically excluded in the Policy.

35.     The Policy does not exclude risks or losses from viruses, epidemics or pandemics, such as coronaviruses like COVID-19.  Thus, Plaintiff reasonably expected that the Policy it purchased from Defendant included coverage for physical loss of or damage to its premises and business interruption losses caused by viruses like COVID-19.

36.     Losses due to COVID-19 are a Covered Cause of Loss under the Businessowners Form.

37.     In addition to coverage for physical loss or damage to property, Society Insurance also agreed to "pay for the actual loss of Business Income" sustained by Plaintiff "due to the necessary suspension" of Plaintiff's "operations" during the period of business interruption "caused by direct physical loss of or damage to covered property" at the Plaintiff's insured premises.  *See* Ex. C, BF § A.5.g.(1)(a).

38.     In the Policy, "suspension" means: (a) "[t]he partial slowdown or complete cessation of your business activities" or (b) "[t]hat a part or all of the described premises is rendered untenantable if coverage for Business Income applies."  *See* Ex. C, BF § A.5.g.(3)(a) and

(3)(b).

39.    In the Policy, "operations" means Plaintiff's "business activities occurring at the described premises." *See* Ex. C, BF § H.11.

40.    In the Policy, "Business Income" is defined in relevant part as: "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred" plus "continuing necessary operating expenses incurred." *See* Ex. C, BF § A.5.g.(1)(c)(ii) and (1)(c)(ii).

41.    Defendant also promised to "pay necessary Extra Expense" Plaintiff incurs during the period of interruption that Plaintiff "would not have incurred if there had been no direct physical loss or damage to covered property at the described premises." *See* Ex. C, BF § A.5.h.(1).

42.    In the Policy, "Extra Expense" is defined in part as "expense incurred: (a) "[t]o avoid or minimize the suspension of business and to continue 'operations': (i) [a]t the described premises; or (ii) "[t]o minimize the suspension of business if [Plaintiff] cannot continue 'operations'"; or (c) to "[r]epair or replace any property[.]" *See* Ex. C, BF § A.5.h.(2).

43.    The Policy also includes "Civil Authority" coverage, pursuant to which Defendant promised to pay for the loss of Business Income and necessary Extra Expense sustained by Plaintiff "caused by action of civil authority that prohibits access" to Plaintiff's premises. *See* Ex. C, BF § A.5.k.

44.    The "Civil Authority" coverage is triggered when (a) any non-excluded cause results in "damage to property other than property" at Plaintiff's insured premises, (b) "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within the area", and (c) the "action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage". *See* Ex. C, BF § A.5.k.

45.     Damage caused by COVID-19 and the related Civil Action Orders triggered the Business Income, Extra Expense and Civil Authority coverages in the Businessowners Form.

### The Global COVID-19 Pandemic

46.     For many years, the Center for Disease Control and the World Health Organization have warned the general public about the possibility of an airborne virus that could cause a global pandemic.

47.     In 2018, the World Health Organization ("**WHO**") issued a 260 page report titled "Managing epidemics – Key facts about major deadly diseases," in which its Director General acknowledged that 2018 marked the 100th anniversary of Spanish flu, the deadliest outbreak in recorded history, in which upwards of 50 million people were killed. In opening remarks of the report, the Director General stated: "Thankfully, we have not seen a public health emergency on that scale since then. But we may at any time. Outbreaks are a fact of life, and the world remains vulnerable. We do not know where or when the next global pandemic will occur, but we do know that it will take a terrible toll, both on human life, and on the global economy."[2]

48.     Coronaviruses are a large family of viruses that can cause diseases in humans, including Severe Acute Respiratory Syndrome (SARS).[3]

49.     Human coronaviruses were first identified in the mid-1960s, starting with Human coronavirus 229E and OC43. New members of coronaviruses that infect humans were discovered in 2002 (MERS), 2003 (SARS), 2004 (NL63) and 2005 (HKU1).[4]

50.     There are four main sub-groupings of coronaviruses:  alpha, beta, gamma, and delta. The seven human coronaviruses that can infect people are (1) 229E (alpha coronavirus),

---

[2]   *See* https://www.who.int/emergencies/diseases/managing-epidemics-interactive.pdf.
[3]   *See* https://www.who.int/emergencies/diseases/managing-epidemics-interactive.pdf at 152; https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics.
[4]   *See e.g.,* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3509683/ and https://www.cdc.gov/coronavirus/mers/about/index.html.

NL63 (alpha coronavirus), OC43 (beta coronavirus), HKU1 (beta coronavirus), MERS-CoV (the beta coronavirus that causes Middle East Respiratory Syndrome, or MERS), SARS-CoV (the beta coronavirus that causes severe acute respiratory syndrome, or SARS), and SARS-CoV-2 (the novel coronavirus that causes coronavirus disease 2019, also known as COVID-19).[5] Covid-19 is a betacoronavirus.[6]

51.     A pandemic is the global outbreak of disease.  Pandemics happen when a new virus emerges to infect people and can spread between people sustainably. Because there is little to no pre-existing immunity against the new virus, it spreads worldwide.[7]

52.     On January 30, 2020, the Director General of the WHO declared the 2019 CoV-2 outbreak a "Public Health Emergency of International Concern."[8]

53.     On February 11th, 2020, the Director General of the WHO named the disease caused by the SARS-CoV-2 as "COVID-19".[9]

54.     On March 11, 2020, the Director General of the WHO declared the COVID-19 outbreak a global pandemic stating, in part, that WHO is "deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[10]

55.     As this Court recently recognized, COVID-19 "is highly contagious and easily transferable." *Elim Romanian Pentecostal Church v. Pritzker*, No. 20 C 2782, 2020 U.S. Dist.

---

[5]   *See* https://www.cdc.gov/coronavirus/types.html.
[6]   *See* https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics.
[7]   *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=A%20pandemic%20is%20a%20global,pandemic%20by%20the%20WHO.
[8]   *See* https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).
[9]   *See* https://www.mdpi.com/1660-4601/17/8/2690/htm.
[10]   *See*  https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

LEXIS 84348, *1-2 (N.D. Ill. May 13, 2020) (finding that "Illinois, the nation, and the world are in the grip of a deadly pandemic the likes of which haven't been experienced in more than a century.").

56.     COVID-19 has spread rapidly and continues to spread across Illinois, the United States and the globe.

57.     On March 11, 2020, WHO reported that there were more than 118,000 cases of COVID-19 in 114 countries.[11]

58.     By May 21, 2020, WHO reported over 4.89 million global confirmed cases of COVID-19, including over 323,000 deaths.

59.     By May 21, 2020, the U.S. Centers for Disease Control and Prevention ("**CDC**") reported over 1.5 million confirmed cases of COVID-19 in the United States, including over 93,000 deaths.

60.     COVID-19 is a physical substance and an organic human pathogen.  A human pathogen is a pathogen that causes disease in humans.

61.     Covid-19 has a crown-like appearance under an electron microscope because of glycoprotein spikes on its envelope. Among the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[12]

62.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit (ICU).[13]

63.     No vaccine is currently available for COVID-19 and understanding its

---

[11]   *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.
[12]   *See* https://www.mdpi.com/1660-4601/17/8/2690.
[13]   *See* https://www.mdpi.com/1660-4601/17/8/2690.

complexities is ongoing.[14]

64.     According to the CDC, the incubation period (the time from exposure to development of symptoms) of COVID-19 ranges from 2–14 days.[15]

65.     COVID-19 has several modes of transmission.  According to WHO, COVID-19 spreads primarily from person to person through small respiratory droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks. People can catch COVID-19 if they breathe in these droplets from a person infected with the virus. COVID-19 physically transforms the air exposed to it and attaches itself to surfaces and structures.  For example, COVID-19 droplets can land on objects and surfaces around the person. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth.[16]

66.     Some people infected with COVID-19 have no symptoms.[17]

67.     According to Harvard University, a person infected with COVID-19, even one with no symptoms, may emit aerosols when they talk or breathe. Aerosols are infectious viral particles that can float or drift around in the air for up to three hours.  Another person can breathe in these aerosols and become infected with COVID-19. COVID-19 also can be spread from contact with infected surfaces or objects. For example, a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes.[18]

68.     Scientific studies have shown that contaminated "fomites" (surfaces or objects) play a key role in the spread of viral infections and that such viruses can survive fomites for extended periods of time.  Fomites consist of both porous and nonporous surfaces or objects that

---

[14]  *See* https://www.mdpi.com/1660-4601/17/8/2690.
[15]  *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#COVID-19-Risk.
[16]  *See* https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.
[17]  *See* https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.
[18]  *See* https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

can become contaminated with pathogenic microorganisms and serve as vehicles in transmission. Fomites can become contaminated with a viruses by direct contact with body secretions or fluid, contact with soiled hands, contact with aerosolized virus (large droplet spread) generated via talking, sneezing, coughing or contact with airborne virus that settles after disturbance of a contaminated fomite (i.e., shaking a contaminated blanket). Once a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites (if brought together).[19]

69.     A recent study by the National Institutes of Health, CDC, UCLA and Princeton University scientists in *The New England Journal of Medicine* also reports that COVID-19 can attach itself to contaminated objects and surfaces for long periods of time.  The study found that COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel.  According to the study, people may acquire COVID-19 through the air and after touching contaminated objects.[20] All of these materials are used in several industries, including, but not limited to, restaurants that prepare and serve food to the general public, such as Plaintiff.

70.     On March 27, 2020, the CDC released a report entitled *"Public Health Responses to COVID-19 Outbreaks on Cruise Ships -Worldwide, February - March 2020."*[21] The report detailed that during this time frame, COVID- 19 outbreaks associated with three different cruise ship voyages caused over 800 confirmed cases and 10 deaths.  *Id.*  The report observed that COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to seventeen (17) days after cabins were vacated on the cruise line, but before disinfection procedures had been conducted.  *Id.*

---

[19]  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1828811/.
[20]  *See* Neeltje van Doremalen, Ph.D., et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, The New England Journal of Medicine (April 16, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973?articleTools=true.
[21]  *See* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w.

71.     A scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV can persist on inanimate surfaces like metal, glass or plastic for up to nine (9) days.[22]

72.     To date, tens of thousands of people in Illinois have been diagnosed with COVID- 19, and it is likely that hundreds of thousands (if not millions) more have been infected by COVID-19 but have not been diagnosed.  While in some cases asymptomatic, COVID-19 is also known to cause severe and sometimes fatal respiratory failure.  This, in addition to the highly contagious nature of COVID-19, renders any property exposed to the contagion unsafe and dangerous.

### Federal Major Disaster Declarations Due to COVID-19

73.     On March 13, 2020, United States President Donald J. Trump declared a nationwide emergency related to COVID-19.

74.     On March 26, 2020, President Trump approved a federal major disaster declaration for the State of Illinois.  He later approved federal major disaster declarations for the surrounding states of  Indiana and Wisconsin on April 3 and April 4, 2020, respectively.

75.     By April 11, 2020, President Trump had approved major disaster declarations for all 50 states, the District of Columbia, and four U.S. territories due to COVID-19.   On information and belief, this was the first time in U.S. history that the President had declared a major disaster in all 50 States at once.

### COVID-19 Cause of Direct Physical Loss and Damage

76.     COVID-19 is a cause of real, direct physical loss and damage.  In April 2020, the Pennsylvania Supreme Court found that the COVID-19 pandemic constitutes a "a natural disaster and a catastrophe of massive proportions" namely because, like other identified natural disasters, it involves "substantial damage to property, hardship, suffering or possible loss of life." *Friends*

---

[22]  *See* https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext.

*of DeVito v. Wolf*, No. 68 MM 2020, 2020 Pa. LEXIS 1987, at \*33 (Pa. Apr. 13, 2020) (finding that the presence of COVID-19 in, and movement through the State of Pennsylvania, authorized the Governor to close the physical operations of businesses).

77.     Since at least 2006, the insurance industry has recognized that the presence of virus or disease can constitute physical damage to property. When preparing so-called "virus" exclusions to be placed in some insurance policies, but not others, the insurance industry drafting arm, the Insurance Services Office, circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

78.     Governments authorities and public health officials throughout the United States have also acknowledged that the spread of COVID-19 causes direct physical loss and damage to property.

79.     Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities triggered the Business Income, Extra Expense and Civil Authority coverages under the Policy.

### Civil Action Orders in Response to the Global Covid-19 Pandemic

80.     The presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the suspension of business at a wide range of establishments, including those with jurisdiction over Plaintiff's businesses.

81.    In response to the COVID-19 pandemic, the Governor of Illinois, J.B. Pritzker, has issued multiple Executive Orders and Proclamations pursuant to the authority vested in him by the Illinois Constitution and the laws of Illinois (the "**Civil Action Orders**").

82.    On March 9, 2020, Governor Pritzker declared all counties in the State of Illinois as a disaster area, specifically "in response to the outbreak of COVID-19" (the "**First Disaster Proclamation**"), which was effective for 30 days, through April 7, 2020.

83.    On March 16, 2020, pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/1, *et seq.*, Governor Pritzker issued Executive Order 2020-07 in response to COVID-19, specifically acknowledging that "the ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages[.]"   As a result, the Governor ordered that:  "Beginning March 16, 2020 at 9 p.m. through March 30, 2020, all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores and food halls—must suspend service for and may not permit on-premises consumption."  *See* Executive Order 2020-07 attached hereto as **Exhibit D**.

84.    Executive Order 2020-07 also prohibited all public and private gatherings in the State of Illinois of 50 people or more commencing March 18, 2020 through the duration of the First Illinois Disaster Proclamation, including any "event or activity that brings together 50 or more people in a single room or a single space at the same time."

85.    Executive Order 2020-07 specifically states, "the Illinois Department of Public Health recommends Illinois residents avoid group dining in public settings, such as in bars and restaurants, which usually involves prolonged close social contact contrary to recommended practice for social distancing[.]"

86.     Executive Order 2020-07 directed the Illinois State Police and other governmental agencies and commissions to enforce the provisions of that order.

87.     Executive Order 2020-07 was issued in direct response to the " COVID-19 outbreak" and the physical presence of COVID-19 on property throughout the State of Illinois. It specifically stated that the goal was to respond to the rapid spread of COVID-19 by restricting in-person interactions in environments with "frequently used surfaces in public settings, including bars and restaurants[.]" It also stated that the "ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages."

88.     Executive Order 2020-07 further recognized frequently used surfaces in public settings, including bars and restaurants, posed a risk of exposure. Indeed, scientific studies have reported that some cleaning products or disinfectants are ineffective against viruses and can result in viral spread or cross-contamination of surfaces.[23]

89.     On March 20, 2020, in response to the rapid spread of COVID-19 in the Greater Chicago Area and throughout Illinois, Governor Pritzker issued Executive Order 2020-10, which, among other things: (1) directed Illinois residents to stay in their homes except when performing "essential" activities, (2) prohibited all public and private gatherings of 10 or more people unless exempted by the order, and (3) required "non-essential" businesses and operations in Illinois to cease operations. *See* Executive Order 2020-10 attached hereto as **Exhibit E**.

90.     Pursuant to Executive Order 2020-10, all businesses in the State of Illinois that offer food or beverages for on-premises consumption, including restaurants and bars, were directed to continue suspending service for, and could not permit, on-premises consumption, through April 7, 2020.  *See* Ex. E at § 1, ¶ 12(l).  Executive Order 2020-10 confirmed that

---

[23] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1828811/.

restaurants and other facilities that prepare and serve food could only do so "for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out." *Id.* The order further empowered State and local law enforcement to enforce the order.

91. On April 1, 2020, Governor Pritzker issued Executive Order 2020-18, in response to the fact that, "in a short period of time, COVID-19 has rapidly spread throughout Illinois". The order continued and extended the prior Executive Orders of March 16 and March 20 through April 30, 2020." *See* Executive Order 2020-18 attached hereto as **Exhibit F**.

92. On April 1, 2020, Governor Pritzker also again declared all counties in the State of Illinois as a disaster area, specifically "in response to the exponential spread of COVID-19" throughout Illinois, finding that a "continuing disaster exists within the State of Illinois" and acknowledging that "***the circumstances surrounding COVID-19 have resulted in the occurrence and threat of widespread and severe damage***, injury, ***and loss of*** life and ***property***" (the "**Second Disaster Proclamation**"). This proclamation was effective immediately and remained in effect for 30 days thereafter, through April 30, 2020. *See* 4/1/20 Proclamation attached hereto as **Exhibit G**.

93. On April 30, 2020, Governor Pritzker again declared all counties in the State of Illinois as a disaster area (the "**Third Disaster Proclamation**") because, among other reasons, COVID-19 has "continued to spread rapidly[.]" This proclamation was effective immediately and was effective for 30 days.

94. On April 30, 2020, Governor Pritzker issued Executive Order 2020-32, effective May 1, 2020, in response to the fact that COVID-19 has "continued to spread rapidly, requiring federal and State governments to take significant steps[.]" The April 30 Order prohibited "[a]ll public and private gatherings of any number of people occurring outside a

single household or living unit[.]" *See* Executive Order 2020-0 attached hereto as **<u>Exhibit H</u>**.

95.     The April 30 Executive Order confirmed that restaurants and other facilities that prepare and serve food could only do so "for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out.  Importantly, the April 30 Order also acknowledged that the COVID-19 virus had the "propensity to physically impact surfaces and personal property" and, for this reason, food should not be eaten at the site where it is provided or at any other gathering site. The April 30 Order empowered State and local law enforcement to enforce the order.

96.     On April 30, 2020, Governor Pritzker issued Executive Order 2020-33, in response to the COVID-19 "emergency" that, among other things, reissued and extended the March 16 Order directing that "all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores and food halls—must suspend service for and may not permit on-premises consumption.  This re-issued order extended the ban through May 29, 2020.  *See* Executive Order 2020-33 attached hereto as **<u>Exhibit I</u>**.

97.     Governor Pritzker's aforementioned disaster proclamations and Executive Orders were in direct response to the continued and increasing presence of COVID-19 at property on or around Plaintiff's premises.

98.     Governor Pritzker issued the Disaster Proclamations and Executive Orders (hereinafter, the "**Civil Action Orders**")  in direct response to the dangerous physical conditions presented by the spread of COVID-19, and prohibited the public from accessing Plaintiff's premises, thereby causing the necessary suspension of their operations and triggering the various coverages under the Policy.

99.     The Civil Action Orders were made in direct response to the continued and increasing presence of COVID-19 on property or around Plaintiff's premises.

100.    The Civil Action Orders prohibited the public from accessing Plaintiff's insured restaurant premises for on-premises consumption of food and beverages, thereby causing the necessary suspension of Plaintiff's restaurant operations.

101.    The Civil Action Orders are not laws or ordinances.

102.    The Governor of the State of Illinois is a civil authority and/or governmental authority under the Policy.

103.    Other governmental authorities and public health officials around the country have similarly acknowledged that the spread of COVID-19 causes direct physical loss of and/or damage to property.  By way of example, and not limitation:

- The State of Indiana issued an executive order recognizing that COVID-19 has the "propensity to **physically impact surfaces and personal property**." (emphasis added);

- The City of New York issued an emergency executive order in response to COVID-19 and the pandemic, in part "because **the virus physically is causing property loss and damage**." (emphasis added);

- The City of Los Angeles issued an order in response to COVID-19 "because, among other reasons, the COVID-19 virus can spread easily from person to person and it is **physically causing property loss or damage** due to its tendency to attach to surfaces for prolonged periods of time." (emphasis added).

- Broward County, Florida issued an emergency order acknowledging that COVID-19 "**is physically causing property damage**." (emphasis added); and,

- The State of Colorado issued a public health order indicating that "COVID-19 … **physically contributes to property loss, contamination, and damage**…" (Emphasis added).

104.     As these orders all recognize, the presence of people infected with or carrying COVID-19 particles throughout the state in places, like Plaintiff's insured premises, where public gatherers typically socialize, eat, drink, or use for entertaining or other recreation renders those places unsafe and unusable. The Civil Action Orders were issued in direct response to these existing dangerous physical conditions.

**Plaintiff's Losses and Damages Related to COVID-19 and the Civil Action Orders**

105.     The presence of COVID-19 on or around Plaintiff's premises has rendered the premises unsafe and unfit for its intended use and therefore caused direct physical loss of and or damage to the insured premises under the Policy.

106.     The Civil Action Orders prohibited access to area immediately surrounding the Plaintiff's insured premises, including properties owned and/or operated by other people and businesses that are subject to the Civil Action Orders.

107.     Plaintiff has sustained direct physical loss of, and/or damage to, Covered Property at the premises described in the Policy as a result of the presence of COVID-19 particles and the resulting Civil Action Orders.

108.     The presence of COVID-19 caused direct physical loss of, and/or damage to, Plaintiff's insured premises by, among other things, denying access to the premises, preventing customers from physically occupying the premises, causing the function of the premises to be nearly eliminated or destroyed, preventing Plaintiff from using the premises for its intended purposes, and/or causing the necessary suspension of business operations at the premises.

109.     The Civil Action Orders prohibit the public from accessing Plaintiff's insured premises described in the Policy, and the area immediately surrounding Covered Property in response to dangerous physical conditions resulting from a Covered Cause of Loss, thereby causing the necessary suspension of its operations and triggering the Business Income, Extra

Expense and/or Civil Authority coverages under the Policy.

110. As a result of the rapid spread of COVID-19 and the Civil Action Orders, Plaintiff has lost Business Income, incurred Extra Expense, and incurred costs to clean and sanitize its insured premises, among other losses.

111. Plaintiff has suffered substantial Business Income losses and Extra Expense caused by: (i) a Covered Cause of Loss, (ii) the presence of COVID-19 at or around Plaintiff's insured premises, and/or (iii) the Civil Action Orders which prohibit access to Plaintiff's insured premises or the production of Plaintiff's products for on-site consumption.

112. Plaintiff's covered losses and damage under the Policy continues to accrue due to the COVID-19 pandemic and the Civil Action Orders.

**Plaintiff's Insurance Claim**

113. On or about March 18, 2020, Plaintiff submitted a timely insurance claim to Society Insurance requesting payment for their business income losses and extra expenses promised under the Policy.

114. Within a few days after submitting the claim, one of Plaintiff's member owners, Glenn Cardelli, called Society to follow up on the claim. The Society representative immediately informed Plaintiff that "every policy claim from all policyholders will be denied" and that Plaintiff "will be getting a registered letter" from Society denying the claim.

115. On April 22, 2020, Society Insurance sent Plaintiff a letter denying its claim for insurance coverage under the Policy, including, any claim under the Business Income, Extra Expense, and Civil Authority coverages in the Policy. *See* Exhibit B. In the letter to Plaintiff, Society Insurance denied that there was a Covered Cause of Loss, but did not identify any exclusion from coverage in the Policy.

116.     Upon information and belief, Society Insurance has uniformly refused to provide Business Income, Extra Expense, Civil Authority, Contamination, or any other coverage to many, if not all, Illinois businesses that have submitted claims under the Businessowners Form as a result of COVID-19 and the Civil Action Orders.

117.     Defendant issued its denials or otherwise refused to respond to policyholder claims without first conducting a meaningful coverage investigation, let alone a "reasonable investigation based on all available information" as Illinois law requires.

118.     Society did not conduct any interviews of Plaintiff's owners or employees in relation to the claims.

119.     Society did not visit the Plaintiff's insured premises to investigate the claims.

120.     In fact, on March 16, 2020, before Plaintiff's had submitted their claim, Society Insurance sent a memorandum from its CEO Rick Parks to Society's "agency partners," acknowledging that states, such as Illinois, had "taken steps to limit operations of certain businesses," but prospectively concluding that Society Insurance's policies would likely not provide coverage for losses due to a "widespread governmental imposed shutdown due to COVID-19 (coronavirus)." *See* Exhibit A.

121.     Society Insurance based its denial, at least in part, on its assertion that the "actual or alleged presence of coronavirus," does not constitute "direct physical loss or damage" under the Policy.  However, Defendant's statement that the alleged or actual presence of a substance like COVID-19 does not result in physical loss or damage to property is contrary to Illinois law: the presence of a dangerous substance in a property constitutes "physical loss or damage." *See, e.g., Bd. Of Educ. Of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E.2d. 622, 625-26 (Ill. Ct. App. 1999), *as modified on denial of reh'g* (Dec. 3, 1999).

122.    Defendant could have excluded viruses and/or pandemic-related losses and damages under the Businessowners Form or another endorsement to the Policy, as other insurers do. In 2006, the Insurance Service Office (ISO) drafted a new endorsement, CP 01 40 07 06 (known as "Exclusion of Loss Due to Virus or Bacteria"), acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents. Endorsement CP 01 40 07 06, which other insurers have since incorporated in policies, provides, among other things, that an insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Defendant did not include any language to this effect in the Businessowners Form.

123.    Instead, Defendant waited until after it collected Plaintiff's' premiums, and after a pandemic and the resulting Civil Action Orders caused catastrophic business losses to Plaintiff's, to attempt to limit its exposure on the back-end through its erroneous assertion that the presence of COVID-19 is not a "physical loss or damage" and is therefore not a covered cause of loss under its Policies.

124.    That fact that the insurance industry has created and often uses specific exclusions for disease causing agents and/or pandemic-related losses under similar commercial property policies undermines Defendant's claim that the presence of a virus, like COVID-19, does not cause "physical loss or damage" to property. Indeed, if a virus could not result in physical loss or damage to property, such specific exclusions for pandemic or virus-related losses would be unnecessary.

125.    Moreover, Defendant's position ignores the coverage provided under the Policy's "Civil Authority" provision for losses incurred due to governmental actions "taken in response to dangerous physical conditions," even if those dangerous physical conditions cause damage to

property at locations other than those insured under the Policy.

126.    Defendant's wholesale, cursory denial of coverage is arbitrary, unreasonable, and inconsistent with the facts and plain language of the Policy. Defendant's denials appeared to be driven by Defendant's desire to reduce or extinguish its own financial exposure to the economic fallout caused by the COVID-19 crisis, rather than its obligation to initiate, as is its legal duty, a full and fair investigation of the claims and a careful review of the Policies it sold to Plaintiff's in exchange for valuable premiums.

## CLASS ACTION ALLEGATIONS

127.    **Class Definition:**   Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), Plaintiff brings this action on behalf of itself and the Class of similarly situated individuals and businesses, defined as follows:

> - All persons and entities in the State of Illinois that: (a) are covered under a Society Insurance "all-risk" insurance policy containing Businessowners Special Property Coverage Form number "TBP2 (05-15)"; (b) have sustained a loss of Business Income and/or Extra Expense under the policy as a result of COVID-19 and the Civil Action Orders; and (c) have been denied coverage for any such loss.

The above class is hereinafter referred to collectively as the "Class." The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

128. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of each defined Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiff's are informed and believe that there are thousands of members of each Class, the precise number of Class members is unknown to Plaintiff's but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized, Court- approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

129. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

a. Whether Society Insurance issued all-risk insurance policies to Plaintiff and members of the Class in exchange for payment of premiums by Plaintiff and the Class members;

b. Whether Plaintiff and the Class suffered a covered loss based on the common policies issued to Plaintiff and members of the Class;

c. Whether COVID-19 causes "direct physical loss of or damage to" property;

d. Whether Society Insurance wrongfully denied all claims based on COVID-19;

e. Whether Society Insurance's Business Income coverage applies to a suspension of operations caused by COVID-19;

f. Whether the Civil Action Orders constitute "action[s] of civil authority" under the Policy;

g. Whether Society Insurance's Civil Authority coverage applies to a loss of Business Income caused by the Civil Action Orders requiring the suspension of operations as a result of COVID-19;

h. Whether Society Insurance's Extra Expense coverage applies to expenses incurred caused by COVID-19;

i. Whether Society Insurance has breached its contracts of insurance with Plaintiff and the Class by denying claims for coverage related to COVID-19 and the Civil Action Orders;

j. Whether Society Insurance has conducted a meaningful coverage investigation, let alone a "reasonable investigation based on all available information"; and,

k. Whether Plaintiff and the Class are entitled to an award of reasonable attorney fees, interest and costs.

130.    **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the other Class members' claims because Plaintiff and members of the Class purchased the same insurance coverage from Defendant containing identical language, Society Insurance denied their coverage claims related to COVID-19 and the Civil Action Orders, Plaintiff's' claims are based upon the same legal theories as those of the other Class members, and Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.

131.    **.Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests that conflict with, or are antagonistic to,  the interests of the other Class members, and Defendant has no defenses unique to Plaintiff.   Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor their counsel have any interest adverse to those of the other members of the Class.

132.    **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).** Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of Defendant's the Businessowners

Form. The prosecution of separate actions by individual members of the Class would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendant in evaluating future claims. Moreover, the adjudications sought by individual Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests.

133.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant acted or refused to act on grounds generally applicable to Plaintiff's and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class.

134.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

**COUNT I**
**DECLARATORY JUDGMENT**
**(Claim Brought on behalf of Plaintiff and the Class)**

135.     Plaintiff incorporates by reference the facts set forth in paragraphs 1-134 above as is fully set forth herein.

136.     Plaintiff's Policy, as well as those of other members of the Class, are insurance contracts under which they paid Defendant premiums in exchange for Defendant's promise to pay

Plaintiff's and the Class's losses for claims covered by the Policies.

137. Plaintiff and other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society Insurance, or Society Insurance is estopped from asserting them.

138. Defendant has arbitrarily and without justification refused to reimburse Plaintiff's and members of the Class for any losses incurred by them in connection with the covered business losses and extra expenses related to the Civil Action Orders and the necessary interruption of their businesses stemming from COVID-19.

139. Society Insurance has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, such that the Court can render declaratory judgment on a class-wide basis.

140. An actual case or controversy exists regarding the rights of the Plaintiff and the Class and Defendant's obligations under their Policy to reimburse Plaintiff and the Class for the full amount of losses incurred by Plaintiff and the Class in connection with the Civil Action Orders and the suspension of their businesses stemming from COVID-19.

141. Pursuant to 28 U.S.C. § 2201, Plaintiff and the Class seek a declaratory judgement from this Court declaring the following:

    a. The losses incurred by the Plaintiff and the Class in connection with the Civil Action Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy;

    b. Society Insurance has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for the losses sustained by the Plaintiff and the Class by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and,

    c. Society Insurance is obligated to pay for the full amount of the losses incurred and to be incurred by Plaintiff and the Class in connection with the covered losses related to the Civil Action Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT II
## BREACH OF CONTRACT
### (Claim Brought on behalf of Plaintiff and the Class)

142.    Plaintiff incorporates by reference the facts set forth in paragraphs 1-141 above as is fully set forth herein.

143.    Plaintiff's Policy, as well as those of other members of the Class, are insurance contracts under which they paid Defendant premiums in exchange for Defendant's promise to pay for the losses sustained by Plaintiff and the Class for claims covered by the Policies.

144.    Plaintiff and the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society Insurance, or Society Insurance is estopped from asserting them, yet Defendant has failed to abide by it insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

145.    By denying coverage for any business losses and extra expense incurred by Plaintiff and the Class in connection with the Civil Action Orders and the COVID-19 pandemic, Society Insurance has breached its coverage obligations under the Policies.

146.    As a result of Defendant's breaches of the policies, Plaintiff and the Class have sustained, and continue to sustain, substantial damages for which Defendant is liable, in an amount to be established at trial.

## COUNT III
### Statutory Claim Pursuant to 215 ILCS 5/155
### (Claim Brought on behalf of Plaintiff and the Class)

147.    Plaintiff incorporates by reference the facts set forth in paragraphs 1-146 above as is fully set forth herein.

148.    Upon receipt of Plaintiff's claims for coverage, Defendant immediately denied the claims without conducting any investigation, let alone a "reasonable investigation based on all available information" as required by Illinois law. *See* 215 ILCS 5/155, *et seq.*

149.    Upon information and belief, Defendant immediately and uniformly denied coverage for losses sustained by Plaintiff and the Class without conducting any investigation, let alone a "reasonable investigation based on all available information" as required by Illinois law. *See* 215 ILCS 5/154.6(h), *et seq.*

150.    Defendant's claim denials were vexatious and unreasonable.

151.    Defendant's denials constitute "improper claims practices" under Illinois law, namely Defendant's (1) refusals to pay the claims of Plaintiff and the Class without conducting reasonable investigations based on all available information and (2) failure to provide reasonable and accurate explanations of the bases in its denials. *See* 215 ILCS 5/154.6(h) and 5/154.6(n).

152.    Accordingly, pursuant to 215 ILCS 5/155, Plaintiff, on behalf of itself and the Class, request that, in addition to entering a judgement in favor of Plaintiff and the Class and against Defendant for the amount owed under the Policies at the time of judgement, the Court enter a judgement in favor of Plaintiff and the Class and against Defendant as part of the taxable costs in the action all attorney's fees and costs, plus an amount equal to the greater of: (a) 60% of the amount which the court or jury finds that Plaintiff and the Class are entitled to recover against Society Insurance under the Policy, exclusive of costs (b) $60,000 per Class member; or (c) the excess of the amount which the court or jury finds that Plaintiff and the Class are entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of their claims prior to the action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Class, respectfully pray that the Court:

1.    Enter an order certifying the proposed Class, as defined above, with Plaintiff Cardelli Enterprise, L.L.C. as the representative of the Class, and appointing Plaintiff's undersigned attorneys as Class Counsel;

2.      Enter a declaratory judgement on Count I of the Complaint in favor of Plaintiff and the Class, and against Defendant, declaring as follows:

      a.      The losses incurred by the Plaintiff and the Class in connection with the Civil Action Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy;

      b.      Society Insurance has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for the losses sustained by the Plaintiff and the Class by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and,

      c.      Society Insurance is obligated to pay for the full amount of the losses incurred and to be incurred by Plaintiff and the Class in connection with the covered losses related to the Civil Action Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

3.      Enter a judgment on Count II of the Complaint in favor of Plaintiff and the Class, and against Defendant, and award damages for breach of contract in an amount to be established at trial;

4.      Enter a judgment on Count III of the Complaint in favor of Plaintiff and the Class, and against Defendant, in the amount equal to the greater of to the greater of: (a) 60% of the amount which the court or jury finds that Plaintiff and the Class are entitled to recover against Society Insurance under the Policy, exclusive of costs (b) $60,000 per Class member; or (c) the excess of the amount which the court or jury finds that Plaintiff and the Class are entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of their claims prior to the action;

5.      Enter a judgement in favor of Plaintiff and the Class and against Defendant  in an amount equal to all attorney's fees and related costs incurred for the prosecution of this coverage action against Defendant, pursuant to 215 ILCS 5/155, to be established at the conclusion of this action;

6.      Award prejudgment and post-judgment interest to Plaintiff and the Class and against Defendant to be calculated according to law; and,

7.      Award Plaintiffs such other, further, and additional relief as this Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all issues so triable.

Respectfully submitted,

CARDELLI ENTERPRISE, L.L.C.,
individually and on behalf of all others
similarly situated

By:   /s/ Antonio DeBlasio
        One of Plaintiffs' Attorneys

***Counsel for Plaintiff and the Proposed Class***

Antonio DeBlasio
David M. Gower
DEBLASIO & GOWER LLC
2001 Midwest Road, Suite 100
Oak Brook, Illinois 60523
Tel. (630) 560-1123
Fax (630) 364-4206
deblasio@DGLLC.net
gower@DGLLC.net


Peter S. Lubin
Patrick D. Austermuehle
Lubin Austermuehle, P.C.
360 W Butterfield Rd #325
Elmhurst, IL 60126
Tel. (630) 333-0333
peter@l-a.law
patrick@l-a.law